518 So.2d 946 (1988)
DOZIER & GAY PAINT CO., INC., a Corporation, Appellant,
v.
Paul E. DILLEY; Frederick A. Labedz, Jr.; Thomas H. Slade III; Ray Council; Rex Council; Hal Council; Max Council; O.E.M. Industrial Coatings, Inc.; and Hercules Bumpers, Inc., Appellees.
No. BR-393.
District Court of Appeal of Florida, First District.
January 5, 1988.
Rehearing Denied February 5, 1988.
S. Perry Penland, Jacksonville, for appellant.
*947 John F. Callender, Jacksonville, for appellees.
JOANOS, Judge.
Dozier & Gay Paint Company, Inc. (Dozier & Gay), appellant/plaintiff, appeals a grant of summary judgment as to appellees/defendants Ray Council, Rex Council, Hal Council, and Max Council (the Councils). The three points presented for our review are whether the trial court erred in granting summary judgment to the Councils with regard to the issues of (1) conversion of trade secrets and other property of Dozier & Gay, (2) tortious interference with Dozier & Gay's business relationships, and (3) civil conspiracy. We affirm as to issues one and two, but reverse with respect to the civil conspiracy issue.
Dozier & Gay is a Jacksonville-based corporation, engaged in the manufacture and sale of industrial coatings. The record reflects that Thomas Slade, Jr. (Slade), father of appellee Thomas Slade, III (Slade III), acquired Dozier & Gay sometime in late 1979 or early 1980. Slade considered Dozier & Gay to be a company with a potential for growth and expansion, which would provide a good business opportunity for his son (Slade III), who had just graduated from college. At the outset, Slade III demonstrated a talent for sales, and proved instrumental in expanding Dozier & Gay's customer lists. Hercules Bumpers, Inc. (Hercules), a Georgia corporation owned and operated by the Councils, proved to be one of the most lucrative accounts Slade III acquired for Dozier & Gay. After Slade III secured the Hercules account, Paul Dilley, chemist with Dozier & Gay, developed a metallic bumper finish for Hercules, which made it possible for Hercules to compete with major automobile bumper manufacturers.
Slade III's initial business contacts with Rex Council developed into a friendship. As a consequence, Slade III and Rex Council spent time together outside the business framework. The record reflects that in 1983 Rex Council received the first intimations that Slade III was unhappy with his job at Dozier & Gay. In early March 1984, while still on the Dozier & Gay payroll, Slade III advised Rex Council that he intended to leave the company. According to Rex Council's deposition, Slade III returned to Council a few weeks later and advised him that he [Slade III] and Paul Dilley were going to leave Dozier & Gay, and were going to start their own business. During the same conversation, Slade III asked Rex if the Council brothers would be interested in backing them in their proposed business venture, in return for ten percent of the new business.
The Council brothers met to consider Slade III's investment proposal. Their depositions demonstrate that their discussions centered on retaining the paint service which had been provided to them by Slade III, by helping Dilley and Slade III set up a new paint venture. A further point of discussion was the type of ownership interest the Councils would have. The record is clear that the Councils' main purpose in financing the new venture was to assure a continuation of the service they had received from Slade III. Ray Council stated that Slade III was the only person who had provided their company with satisfactory service and had made their paint successfully. The Councils decided to request a fifty percent interest, because they were taking the total financial risk.
Two or three days after their private meeting, the Councils met with Dilley and Slade III. It was agreed that the Councils would have a fifty percent interest in the business, and in return they would supply the capital and a $100,000 line of credit. Shortly thereafter, Ray Council arranged to lease a building which Slade III had selected as appropriate for the new business. Ray Council also selected the attorney who prepared the incorporation documents for the new business.
The Paul Dilley deposition reflects that it was the latter part of March 1984 when he and Slade III decided to go into business together in Georgia. Dilley's account differs slightly from that of the Councils. According to Dilley, the Council brothers approached him and Slade III with the offer of a credit line in exchange for half the *948 stock in the business. Approximately two weeks before Dilley and Slade III left Dozier & Gay, Dilley advised another Dozier & Gay employee, Rick Labedz, of their plans. Dilley and Slade III formally resigned on Friday, April 27, 1984. Labedz had resigned shortly before, and was unemployed until he went to work for the new company. The new company started in business on May 1, 1984.
On Saturday, April 28, 1984, the morning after Slade III and Dilley resigned, Lawrence Moran, Dozier & Gay operations manager, discovered that Dilley and Slade III had left the company. Dozier & Gay routinely conducted an inventory on the last Saturday of each month, and Moran had gone to the business premises for that reason. The Dozier & Gay inventory conducted just hours after the departure of Dilley and Slade III, revealed that many items significant to Dozier & Gay's operation were missing. Among the missing items were a laboratory book, most of the company's best formulas, product development files, and Slade III's sales reports. In addition, some of Dozier & Gay's formulas had been erased from its computer. Dilley, Labedz, and Slade III all admitted removing personal items from Dozier & Gay premises, but denied taking any Dozier & Gay materials.
The depositions of the Council brothers contain their assertions that they would not have agreed to back the new company if there had been any suggestion that Dilley and Slade III would take materials from Dozier & Gay. On October 30, 1986, the trial court entered an order granting summary judgment as to the Council brothers and Hercules Bumpers, Inc. Dozier & Gay's motion for rehearing was denied, and this appeal followed.
Summary judgment is appropriate only if the movant demonstrates "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fla.R.Civ.P. 1.510(c); McCurdy v. Collis, 508 So.2d 380, 382 (Fla. 1st DCA 1987). In determining a motion for summary judgment, the court must draw every possible inference in favor of the person against whom summary judgment is sought. Furthermore, "[i]f the evidence raises any issue of material fact, if it is conflicting, if it will permit different reasonable inferences, or if it tends to prove the issues, it should be submitted to the jury as a question of fact to be determined by it." Moore v. Morris, 475 So.2d 666 (Fla. 1985). See also Holl v. Talcott, 191 So.2d 40 (Fla. 1966); Taylor v. Kenco Chemical Manufacturing Corp., 465 So.2d 581 (Fla. 1st DCA 1985).
The party moving for summary judgment must tender evidence sufficient to support his claim of the nonexistence of a material issue. If he does so, the opposing party must demonstrate the existence of such issue by countervailing facts or justifiable inferences to be drawn from those facts. DeMesme v. Stephenson, 498 So.2d 673 (Fla. 1st DCA 1986). A mere denial of the allegations of the complaint is insufficient to show the non-existence of a material issue. Williams v. McNeil, 442 So.2d 269 (Fla. 1st DCA 1983).
The fourth count of the Dozier & Gay complaint alleged that the Councils and Hercules conspired with Dilley, Labedz, and Slade III to interfere with Dozier & Gay's business relationships and to convert Dozier & Gay's materials and trade secrets.
A conspiracy is 
a combination of two or more persons by concerted action to accomplish an unlawful purpose or to accomplish some purpose by unlawful means. See Kent v. Kent, 431 So.2d 279 (Fla. 5th DCA 1983). Each act done in pursuance of a conspiracy by one of several conspirators is an act for which each is jointly and severally liable. 10 Fla.Jur.2d § 3, Conspiracy  Civil Aspects (1979).
Nicholson v. Kellin, 481 So.2d 931, 935 (Fla. 5th DCA 1985). It is well settled that "a conspiracy may be proven by circumstantial evidence." Northwestern National Insurance Co. v. General Electric Credit Corp., 362 So.2d 120, 123 (Fla. 3d DCA 1978), citing Resnick v. State, 287 So.2d 24 (Fla. 1973). (emphasis in the original). Accord Anheuser-Busch, Inc. v. *949 Campbell, 306 So.2d 198, 200 (Fla. 1st DCA 1975).
The gist of an action for civil conspiracy is not the conspiracy itself, but the civil wrong done pursuant to the conspiracy which results in damage to the plaintiff. Blatt v. Green, Rose, Kahn & Piotrkowski, 456 So.2d 949, 950 (Fla. 3d DCA 1984); American Diversified Insurance Service, Inc. v. Union Fidelity Life Insurance Co., 439 So.2d 904, 906 (Fla. 2d DCA 1983).
In Security Title & Abstract, Inc. v. First American Title Insurance Company, 414 So.2d 604 (Fla. 1st DCA 1982), this court considered conspiracy allegations analogous to those presented in the instant case. In Security Title, First American and T & T Holding Company were prospective purchasers of Security Title. T & T purchased the corporation for 1.7 million. However, a few months later and at a fraction of the cost, First American effectively acquired the assets of Security Title's principal income producer, Tallahassee Title Company. Security Title's complaint alleged that the Tallahassee Title manager Conway and other trusted employees, with assistance from First American and co-defendant Julian Boos, formed a competing title company "by tortiously pirating away most of Tallahassee Title's valued employees and valuable customers, and by surreptitiously photocopying Tallahassee title records." 414 So.2d 604. It was undisputed in Security Title that First American provided financial backing and exercised some control in the newly formed company. The trial court denied summary judgment for Conway, but granted summary judgment for First American and Boos, concluding the evidence did not show they had participated in the tortious acts. The trial court expressed concern that the plaintiff sought to convert an agreement to enter into a competing business as a "conspiracy." This court found, however, that in light of the deposition testimony and other evidence in the record, a jury could reasonably infer that First American and Boos had participated in the allegedly tortious activities, and reversed the award of summary judgment.
In the instant case, it is undisputed that: (1) Slade III, Dilley, and Labedz resigned suddenly from Dozier & Gay; (2) Labedz packed and removed four boxes of items from Dozier & Gay premises; (3) an inventory conducted the day after the Dilley  Slade III resignation revealed that lab records, formulas, customer lists, research records, and raw materials were missing from the Dozier & Gay premises; (4) while employed by Dozier & Gay, Dilley perfected a paint technique wholly satisfactory to Hercules Bumpers, formerly a customer of Dozier & Gay; (5) early in March 1984, the Council brothers were apprised of the planned departure of Dilley and Slade III; (6) the Council brothers agreed to provide financial backing for Slade III and Dilley to protect the paint source for Hercules; (7) the new corporation, OEM, was set up before Dilley and Slade III left Dozier & Gay; (8) the Council brothers knew Dilley and Slade III were still on the Dozier & Gay payroll when they (the Councils) agreed to finance the new company; (9) the Council brothers caused Hercules to guarantee a line of credit for OEM; (10) the Council brothers are fifty percent shareholders in OEM; and (11) OEM is a competitor of Dozier & Gay, and sells paint to many of Dozier & Gay's former customers.
The Council brothers have acknowledged the foregoing facts justify an inference that Slade III, Dilley, and Labedz removed assets of Dozier & Gay on their departure. However, the Councils urge, and rely on their deposition testimony as support, that they would not have wanted to be involved in the formation of OEM if it had been suggested that the former Dozier & Gay employees would take Dozier & Gay property when they left the company.
The interference count of the complaint alleges that (1) Hercules interfered by becoming a customer of OEM, by aiding the departure of the Dozier & Gay employees to OEM, and by guaranteeing the credit of OEM; and (2) the Council brothers individually aided, assisted and encouraged the conversion, and assisted in forming OEM. The Council brothers and Hercules maintain their only participation which would affect Dozier & Gay was the decision to *950 stop buying paint from Dozier & Gay, and to begin buying paint from OEM. The Councils contend that as fifty percent shareholders of OEM and owner-operators of Hercules, they have a privilege to interfere with Hercules' business relationships with Dozier & Gay.
Dozier & Gay counters by pointing out that the complaint alleged a tortious interference with many business relationships, including Hercules Bumpers. The record reflects that many of Dozier & Gay's former customers are now customers of OEM, thus it is clear that the Council brothers' assistance in the formation of OEM has damaged other of Dozier & Gay's business relationships. In other words, the interference has not been limited to that of the Hercules account. Such interference could be viewed as an unavoidable collateral effect of the privilege enjoyed by one who is a party to the contract. We note, however, that in this case the Council brothers were instrumental in creating the entity which is now the vehicle for the interference.
In summary, the record in this case establishes that in March 1984, when Dilley and Slade III were employed by Dozier & Gay, the Council brothers met with them on at least two occasions. As a result of those meetings, the Council brothers agreed to provide financial backing, through Hercules Bumpers, for the formation of OEM, a competitor of Dozier & Gay.
The conspiracy allegations of the complaint are directed to the Council brothers individually and to Hercules Bumpers as a corporate entity. Although the Councils argue in response that as inactive shareholders of OEM, they are not liable for its alleged torts, the argument avoids the issue. Dozier & Gay charges that the Council brothers and Hercules conspired with Dilley and Slade III to interfere with Dozier & Gay's business relationship. At the point in time of the alleged conspiracy, there was no OEM  hence Dozier & Gay has not alleged conspiracy of the Council brothers in their capacity as shareholders of OEM.
Based on the foregoing, we find there are genuine issues of material fact with regard to the Council brothers' participation in the allegedly tortious activities in this case. Therefore, the order of summary judgment is reversed as to the civil conspiracy count.
SMITH, C.J., and WENTWORTH, J., concur.