698 So.2d 1328 (1997)
Stacy L. RIVERS, Tynesha M. Rivers, Nikina D. Cunningham, and Stacy L. Rivers, as parent and custodian for Tevon J. Elmore, a minor, Appellants,
v.
DILLARDS DEPARTMENT STORE, INC., a Florida Corporation, Linda Love, and James Donohoe, Appellees.
No. 96-3370.
District Court of Appeal of Florida, First District.
September 12, 1997.
*1329 Michael R. Rollo, Pensacola, for appellants.
Thomas R. Jenkins of Bozeman, Jenkins & Matthews, P.A., Pensacola, for appellees Dillards and Love.
Millard L. Fretland of Carlton, Fields, Ward, Emmanuel, Smith & Cutler, P.A., Pensacola, for appellee James Donohoe.
PER CURIAM.
Stacy Rivers, her young son, her sister, Tynesha Rivers, and Nikina Cunningham went into Dillard's department store on August 20, 1994. Stacy and her son went upstairs while Tynesha Rivers and Nikina Cunningham went to the shoe department. As they were waiting for a sales person to bring a pair of shoes from the stock room, officer Donohoe, a uniformed off-duty city police officer employed by Dillard's as a security guard, approached and asked Tynesha Rivers and Nikina Cunningham for identification. At that time, Donohoe did not give a reason for his request, but the women complied. Donohoe left the immediate area with their drivers' licenses and returned after a period of time. Meanwhile, Tynesha Rivers purchased a pair of shoes.
When Donohoe returned, he directed the two to another area of the store. At one point, Donohoe placed his hand on Cunningham's arm. The two said in depositions that they did not feel they could fail to comply with Donohoe's requests due to the show of authority. When Stacy Rivers and her son arrived in the area, Donohoe asked her for identification, also. He would not explain when the women asked why they were being detained. He escorted the four to an area near the shoe department where he directed them to sit and wait, while continuing to hold their drivers' licenses. As they waited, they could see, behind swinging doors, a hallway where photos were posted on a bulletin board labeled "Wall of Shame."
Love, a female store supervisor, came to the area with a camera, and Donohoe proceeded to photograph Stacy Rivers without her consent. The camera malfunctioned or ran out of film, and he took no other photos. Love advised the women they were no longer welcome on store property and they were being warned they could be arrested for trespass if they returned. Stacy asked to return the shoes she had just purchased, but Donohoe would not allow her to do so at that time. The women were evicted from the store. According to their depositions, none of them had ever been convicted or suspected of committing a criminal offense before they were detained that day; neither had they been accused of shoplifting at Dillard's or any other department store.
Stacy and Tynesha Rivers and Nikina Cunningham sued Dillard's, Love, and Donohoe for false imprisonment, intentional infliction of emotional distress, invasion of privacy, battery, libel, and conspiracy. Among other things, they alleged that they were detained without any legal reason, and that photos were taken against their will and placed in *1330 public view on the "wall of shame." After appellee moved for summary judgment, appellants and appellees submitted affidavits and depositions, from which the following accounts have been taken.
In her deposition, Nikina Cunningham said that while Donohoe asked them to come with him, he did not accuse them of shoplifting. When they asked him what the problem was, he said to wait and talk with the sales manager. She was upset sitting there in front of people; they were near a clearance rack and people were looking over at them. She said Donohoe touched her just to guide her to where they were going, and that she did not think he was trying to touch her for any other reason, just that she didn't know where he wanted her to go. She added that she really didn't pay much attention to that part of the incident. She saw the bulletin board with photos inside a swinging door that employees went through, although she was not close enough to distinguish facial features on the photos. She said she still did not know why she was evicted from the store.
Stacy Rivers said she had never had any problem in a store regarding shoplifting. When they arrived at Dillard's, she and her son went upstairs, and when she came downstairs, the officer approached and asked her for identification. He asked them to follow him. She asked, in a normal voice, whether there was a problem, but there was no scene or loud talking. She was puzzled but not angry at that point. The area he took them to was near the north entrance to the store, where there were some chairs in a hallway outside of an office. Donohoe told them to have a seat and wait for the store manager. He said they were not under arrest, but they could not leave. She observed a store employee walk by and look at them, go into the office, and then leave. After that, Love arrived, carrying a camera, and informed them that they were not welcome in the store and would be trespassing if they returned. Donohoe attempted to photograph them, and succeeded in taking her photograph, which ended up on the "wall of shame." She could not make out any of the faces on the wall from the picture that later appeared in the newspaper, nor could she make them out from the other side of the swinging doors. She said she had felt embarrassed while at the store being escorted by a uniformed officer.
Tynesha Rivers said she went to Dillard's to match shoes with a shirt she had purchased earlier, and she did purchase the shoes while she was there. She was upset because the officer would not explain, and he raised his voice and said if they did not do as he said they would be arrested. She could not distinguish faces in the photos on the wall from where she was sitting.
Donohoe said he has dual employment with the City and Dillard's to provide security, and that they took photos of people who had been warned not to return to the store. He did not know the origin of that practice. On that day, an employee told him she suspected the three of shoplifting in the past in her section of the store, because on past occasions, she had found empty hangers and tags on the floor, and they would split up when they entered the store. He said another employee verified this account. Donohoe said that one of the managers had to issue the warning; he could not do it himself. He asked the women for identification, and they obliged. They started to become loud, and he asked them to follow him to a more secluded area and asked them to keep it down, but it got worse as they got closer to the exit. He determined that there were no outstanding warrants on any of them. Love brought the camera, and he tried to take pictures, but the camera malfunctioned. Love warned them not to return or they would be arrested for trespass. He told them two employees suspected them of shoplifting in the past, and returned their identification to them just before they were released to exit the store. He said they were very loud from the time they were with him in the shoe department until they left. They asked to return the shoes, but he told them to make an appointment with management to do so.
Love said they use off-duty police officers for security. An employee called her about the three, saying she had seen them before and thought they were a problem. The employee had already spoken to Donohoe. Love told Donohoe she wanted to ask the *1331 women to leave the store. She told them they could not return or they would be arrested for trespassing. She did not tell them the reason. They were becoming loud and using profanity, so she asked Donohoe to escort them from the store. She had to go upstairs to get the camera, which took 5-8 minutes. They took photos of people who have been arrested or who they do not want in the store so that employees will know who they are, although the wall is no longer there. The wall had been located through the doors into the warehouse, to which only employees have access. She did not know when the wall was started, but it was there when she began working at Dillard's.
The salesgirl who first called attention to the three said in her deposition that she recognized the women as having been in the store numerous times, and said they were having problems with them. She indicated they exhibited characteristics of shoplifters, such as separating immediately after entering the store, and gathering clothes into a certain area of the store where they could not be seen. She said employees would find the clothing on racks after they left, as well as empty hangers and tags on the floor. She called Donohoe and asked if they could ask them to leave. Donohoe said the manager would have to do it. She had been instructed that if she felt uncomfortable she was supposed to call security.
The trial court granted summary judgment for the defendants on all counts. The court determined that regardless of the existence of some factual dispute, the actions complained of did not rise to the level of outrageousness required for intentional infliction of emotional distress. Further, as to invasion of privacy, as a matter of law, there was no intrusion, as appellants came onto Dillard's property, and there was no evidence of publication of any facts to the public at large.[1] As to false imprisonment, the court ruled that the store has an absolute right to ask any person to leave the premises, that probable cause is not an issue in a civil case, and that Donohoe was acting within his legal authority as a law enforcement officer, and that authority protects Dillard's and Love. Further, the court found that even if the photo of Stacy was placed on the wall, Dillard's could communicate to its employees the identity of persons not welcome on the premises, and the defendants did not initiate the newspaper publication about the "wall of shame." The court concluded that, since the underlying claims failed, the conspiracy claim would fail as well. Finally, the judge ruled that the battery claim would fail because Donohoe's action was privileged.
Having reviewed the record and arguments presented, we conclude that the trial court correctly granted summary judgment on the claims of intentional infliction of emotional distress, invasion of privacy[2], libel, and battery, and we affirm as to those counts. As to the claim of false imprisonment, however, the trial court erred in granting summary judgment because there are genuine issues of material fact as to whether it was legally permissible to detain the plaintiffs in the manner and for the duration indicated here.
"The tort of false imprisonment or false arrest is defined as `the unlawful restraint of a person against his will, the gist of which action is the unlawful detention of the plaintiff and the deprivation of his liberty.'" See Escambia County School Board v. Bragg, 680 So.2d 571 (Fla. 1st DCA 1996) (citations omitted). A plaintiff must show that the detention was unreasonable and unwarranted under the circumstances. See Harris v. Lewis State Bank, 436 So.2d 338 (Fla. 1st DCA 1983). "In a false arrest action ... the plaintiff is required only to establish imprisonment contrary to his will and the unlawfulness of the detention.... Probable cause may then be raised and proved by the defendant, as an affirmative defense." See Rotte v. City of Jacksonville, *1332 509 So.2d 1252 (Fla. 1st DCA 1987). "A privilege exists as a matter of law to engage in reckless or even outrageous conduct if there is sufficient evidence that shows the defendant `did no more than assert legal rights in a legally permissible way.'" See Canto v. J.B. Ivey and Co., 595 So.2d 1025 (Fla. 1st DCA 1992).
The movant for summary judgment must demonstrate the absence of genuine issues of material fact, and in reviewing summary judgment, this court must view the record in the light most favorable to the non-moving party. See Moore v. Morris, 475 So.2d 666 (Fla.1985); Holl v. Talcott, 191 So.2d 40 (Fla.1966). There appears to be no dispute that, under certain circumstances, a store owner may ask a member of the public to leave the premises and warn them that if they return, they will be trespassing. We have found little case law explaining the extent of this prerogative. In State v. Woods, 624 So.2d 739, 740 (Fla. 5th DCA 1993), review denied 634 So.2d 629 (Fla.1994), the court noted that "shopping malls are quasi-public places which must be open to the public on a nondiscriminatory basis. But the owner of such a mall does not lose all control over its private ownership interest." In Woods, the court quoted Corn v. State, 332 So.2d 4 (Fla.1976): "The invitation [to shop] presupposes that the conduct of persons coming there will be in keeping with such purposes. However, reasonable nondiscriminatory restrictions pertaining to the use of the mall may be placed on the users of such mall...."
If indeed the women had engaged in the conduct described by the store employee who initially called attention to them, the store may have been justified in ejecting them. Arguably, however, more than a mere warning not to return to the store occurred in this case. There appears to be a serious question whether, in issuing the warning, it was legally permissible for the appellees to detain appellants for as long as 25 minutes, retain their drivers' licenses so that they could not leave, and, perhaps without informing them why they were being detained, attempt to photograph them for the "wall of shame" before issuing the warning not to return. It is undisputed in this case that the women were not suspected of shoplifting or any other offense (or even of disruptive behavior before the detention) on the day in question.
To analyze the case, we believe it is necessary to separate the right to eject someone who, for appropriate, nondiscriminatory reasons, is not welcome on the premises, from the right to detain someone suspected of an offense such as shoplifting. The existence of probable cause is not an issue in this case because, admittedly, no one suspected the women of any illegal activity on the day in question. Thus section 812.015, Florida Statutes, did not provide a basis to detain them. The alleged legal authority at work in this case was the property owner's right to exclude the women from the quasi-public property for an appropriate reason after a warning. Section 810.08(1), Florida Statutes,[3] does not provide an absolute basis for the detention, since the warning had not yet been issued, although we agree that, implicitly, some detention may be necessary in order to issue the warning alluded to in that section. The detention still must be reasonable under the circumstances.[4]
Apparently it was necessary for a store manager to issue the warning on behalf of the store, rather than the officer, and for that reason some delay may have been reasonable. But the length of the detention here and the manner in which it was accomplished, *1333 including the attempt to photograph the women before allowing them to leave, create a factual issue as to the reasonableness of the procedure followed in the course of issuing the warning. The ultimate question is whether the detention was reasonable and warranted under the circumstances. This question of fact cannot be decided on summary judgment, therefore we reverse as to the claim of false imprisonment.
The plaintiffs also asserted a civil conspiracy claim. The trial court ruled only that since all the underlying claims failed, there could be no conspiracy. "A conspiracy `is a combination of two or more persons by concerted action to accomplish an unlawful purpose or to accomplish some purpose by unlawful means.'" See Dozier & Gay Paint Co. v. Dilley, 518 So.2d 946 (Fla. 1st DCA 1988), citing Kent v. Kent, 431 So.2d 279 (Fla. 5th DCA 1983).
The gist of a civil action for conspiracy is not the conspiracy itself, but the civil wrong which is done pursuant to the conspiracy and which results in damage to the plaintiff .... (citations omitted) Thus, a cause of action for civil conspiracy exists... only if "the basis for the conspiracy is an independent wrong or tort which would constitute a cause of action if the wrong were done by one person."
See Blatt v. Green, Rose, Kahn & Piotrkowski, 456 So.2d 949 (Fla. 3d DCA 1984). Since we are reversing as to the false imprisonment claim, the trial court should reconsider the conspiracy claim.
In the First Amended Complaint, appellants alleged that Love was, at all times during the incident, an employee of Dillard's, and that Donohoe was at all times an employee of the City of Pensacola. The record reflects there is some uncertainty about Donohoe's employment status at the time of the incident, as he was employed by Dillard's to provide security, although he did wear a city police officer's uniform. In any case, we note that, to the extent appellants seek to assert a claim of civil conspiracy against all of the defendants/appellees, absent allegations that an employee "acted in a personal capacity apart from his employee status, [a] corporation cannot conspire with its own ... employees." Garrido v. Burger King Corp., 558 So.2d 79 (Fla. 3d DCA 1990).
REVERSED and REMANDED for further consistent proceedings.
JOANOS and WOLF, JJ., concur.
VAN NORTWICK, J., concurs in part and dissents in part with written opinion.
VAN NORTWICK, Judge, concurring in part and dissenting in part.
I concur in the majority opinion's affirmance of the summary judgment as to the libel, invasion of privacy, and battery counts and in the reversal of the summary judgment as to the false imprisonment and conspiracy counts. Because I believe that disputed issues of material fact remain as to the claim of intentional infliction of emotional distress, I would also reverse the summary judgment as to that count. Thus, I must respectfully dissent in part.
Florida recognizes the independent tort of intentional infliction of emotional distress as defined in section 46 of the Restatement (Second) of Torts. Metropolitan Life Ins. v. McCarson, 467 So.2d 277 (Fla.1985); see Restatement (Second) of Torts, § 46 (1965). The elements of a cause of action for this tort are:
(1) the wrongdoer's conduct was intentional or reckless; that is, the wrongdoer intended the behavior when he knew or should have known that emotional distress would likely result;
(2) the conduct was outrageous; that is, beyond all bounds of decency, atrocious, and utterly intolerable in a civilized community;
(3) the conduct caused emotional distress; and
(4) the emotional distress was severe.
State Farm Mut. Auto. Ins. Co. v. Novotny, 657 So.2d 1210, 1212 (Fla. 5th DCA 1995); Williams v. City of Minneola, 575 So.2d 683, 691 (Fla. 5th DCA 1991). Because this tort could involve either the deliberate or reckless infliction of mental suffering and must involve outrageous conduct, the cause of action is more appropriately termed "outrageous *1334 conduct causing severe emotional distress." See City of Minneola, 575 So.2d at 690; Dominguez v. Equitable Life Assurance Soc'y of the U.S., 438 So.2d 58, 59 (Fla. 3d DCA 1983), approved, 467 So.2d 281 (Fla. 1985); see also Florida Standard Jury Instructions in Civil Cases, MI 10, page 1.
In determining whether the element of "outrageous conduct" has been established, we must look at the evidence in the light most favorable to the alleged sufferer of emotional distress. Mallock v. Southern Mem'l Park, Inc., 561 So.2d 330 (Fla. 3d DCA 1990). Although Florida courts have recognized that the issue of "outrageousness" may be "a legal question in the first instance for the court to decide as a matter of law," Baker v. Florida Nat'l Bank, 559 So.2d 284, 287 (Fla. 4th DCA 1990), the trial court should decide the issue as a question of law only "when the facts of a case can under no conceivable interpretation support the tort." City of Minneola, 575 So.2d at 692. "[W]here significant facts are disputed, or where differing inferences could reasonably be derived from undisputed facts, the question of outrageousness is for the jury." Id.
In the order on appeal, the trial court acknowledges factual conflict on this issue. Viewing the circumstances of the instant case most favorable to appellants, I cannot conclude that there is no conceivable interpretation of these facts on which a finder of fact could determine that the actions of the appellees were outrageous. Thus, in the instant case, the question of whether appellees' conduct was outrageous should be one for the jury. As a result, I would reverse the summary judgment on the claim for intentional infliction of emotional distress.
NOTES
[1] At some point, a newspaper article came out mentioning the incident. The article included a photo of the "wall of shame." The only evidence was that a news reporter gained access to the wall area through unauthorized means.
[2] The undisputed evidence in the record is that the actual faces in the photographs on the wall could not be identified, either from outside the swinging doors that gave access to an area not open to the public, or from the newspaper article and accompanying photograph of the wall.
[3] Section 810.08(1) provides:

Whoever, ... having been authorized, licensed, or invited, is warned by the owner or lessee of the premises, or by a person authorized by the owner or lessee, to depart and refuses to do so, commits the offense of trespass in a structure or conveyance.
[4] We find additional general support for our view that section 810.08(1), Fla.Stat., does not provide an absolute basis for this detention in Chief Judge Griffin's comments in her dissenting opinion in L.K.B. v. State, 697 So.2d 191, 22 Fla. Law Weekly D1735 (Fla. 5th DCA, July 18, 1997), pertaining to the permissibility of a detention for purposes of issuing a trespass warning under section 810.09(1), Fla.Stat. Both sections 810.08(1) and 810.09(1) deal with trespass after warning, although 810.08 deals with trespass of a structure or conveyance, and 810.09 with trespass on property other than a structure or conveyance.