[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 13-13507
_____

D.C. Docket No. 6:10-cv-01180-CEH-DAB

MONICA BARTLEY,
NEISHA HIGGS,
DARRYEL WOODSON,
LEKEITHIA BRYSON, as Administrator of the Estate of T.D. Bryson,
KEVIN WALLACE,

Plaintiffs-Appellees,

JOSHUA BRYSON,

Plaintiff,

versus

KIM'S ENTERPRISE OF ORLANDO, INC.,
a Florida for profit corporation,
d.b.a. "Magic Mall" and "Magic Outlet"
and "Magic Outlet Mall", et al.,

Defendants,


FLORIDA INTRACITY PATROL, INC.,
a Florida for profit corporation,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(June 11, 2014)

Before CARNES, Chief Judge, DUBINA and SILER,[*] Circuit Judges.

PER CURIAM:

Florida Intracity Patrol, Inc. ("FIP"), a private security company that provided security services for the Magic Outlet Mall in Orlando, appeals the final judgment against it on the plaintiffs' state law claims for false detention. FIP challenges the district court's denial of its motion for judgment as a matter of law, contending that it cannot be held liable for false detention because the plaintiffs' brief detention by the Orange County Sheriff's Department was not unlawful and, in any event, it did nothing more than accurately report the commission of a crime. FIP also challenges the denial of its motion for a new trial, which impugned the district court for failing to disclose a jury question on damages and for issuing a response that materially altered the jury instructions on compensatory damages.

I. FACTS

Darryel "White Folks" Woodson, a black writer, entertainer, and self-styled "player," has published two books and produced a series of popular YouTube

---

[*] Honorable Eugene E. Siler, Jr., United States Circuit Judge for the Sixth Circuit, sitting by designation.

2

videos, which have amassed an online following of some 300,000 viewers.[1]  With

the help and financial backing of T.D. Bryson, Woodson assembled an all-black

film crew to travel from Atlanta, Georgia, to Orlando, Florida, during the weekend

of November 22, 2008, to shoot some footage during the annual Florida Classic

football game.  In addition to Woodson and Bryson, the group consisted of Charles

Wilson, Jr., Calvin Ivory, Monica Bartley, Neisha Higgs, Edrichus Sykes, and

Kevin Wallace.  Wallace, a Georgia police officer, and Sykes, an unlicensed

private security guard, were hired to provide security for the film crew and to

enhance Woodson's cultivated image as an important entertainer.

    In the early evening hours of November 22, 2008, the six men and two

women huddled into a rented stretch limousine and made a brief stop at the Magic

Outlet Mall in Orlando so that Wallace, who was ill-prepared for the unexpectedly

cold night, could buy a long-sleeve shirt.  Wallace, the off-duty Georgia police

officer, was carrying a concealed weapon.  Sykes, his fellow bodyguard, wore a

dark-colored battle dress uniform and bullet-proof vest with no identifying

insignia, patches, or other markings, and was openly carrying a .380 semi-

automatic handgun in his hip holster.  He assumed that his Georgia firearm permit,

which covered both concealed and open carry, allowed him to tote an exposed

---

[1] Because FIP is challenging the denial of its motion for judgment as a matter of law, the facts are presented in the light most favorable to the plaintiffs.  See Lamonica v. Safe Hurricane Shutters, Inc., 711 F.3d 1299, 1312 (11th Cir. 2013).

3

firearm in Florida as well.  Unbeknownst to Sykes, Florida's reciprocity with Georgia did not extend to openly carrying a firearm; instead, that act qualified as a second-degree misdemeanor under Florida law.  See Fla. Stat. § 790.053.

After the group pulled into the mall's parking lot, Wallace headed straight into the mall while the others momentarily lingered outside the limousine.  An FIP security guard slowly drove past, spotted Sykes, and called in a report to his colleagues of a man in a battle dress uniform openly carrying a firearm.  Five or six mall security guards, including FIP Chief David Hesselink, arrived in their marked security cars, got out with their guns drawn, and trained their weapons on the group.  With his hands in the air, Sykes approached Hesselink, voluntarily produced his Georgia identification card and firearm permit, and informed Hesselink that he and Wallace were providing security for the rest of the group while they filmed around Orlando.  Sykes also told Hesselink that Wallace, who had already entered the mall, was a Georgia police officer and was carrying a concealed firearm.  Although Hesselink knew that it was a second-degree misdemeanor in Florida to openly carry a firearm, he neglected to mention that fact to Sykes and allowed him to enter the mall with his exposed handgun.

Once Hesselink released the group, Bartley, Higgs, Woodson, and Ivory overheard him say into his radio that everything was "all clear" and that the group members were just a bunch of "'wannabe' rappers."  Taking umbrage at that final

4

remark, Ivory shot back, "Just like you a 'wannabe' cop." Hesselink replied, "We'll see about that." After the remaining group members entered the mall, Hesselink promptly placed a 911 call to the Orange County Sheriff's Department, reporting "two individuals, signal zero, inside [the] mall," one of whom was "supposedly a Georgia police officer" and the other who was working "protection," sporting a battle dress uniform with an exposed firearm, and had produced a Georgia firearm permit when stopped outside the mall. A "signal zero" denotes either armed, use caution, or armed threat, and it automatically triggers an urgent "code three" police response with "lights and sirens." Hesselink also told the 911 operator that his security guards were themselves "signal zero," suggesting that he understood that signal to simply mean armed, and that they were going to "block off the entrances" to the mall and "try to contain [the two men] or at least know where they are once your deputies get here." Hesselink did not mention anyone but Sykes and Wallace, nor did he expressly request any particular police response.

While the plaintiffs insist that a "signal zero" unambiguously signifies a single thing — an armed threat — the record does not support that limited interpretation. At trial, both the 911 operator and the 911 dispatcher testified that it can mean either armed person or armed threat; that it is an appropriate signal to use when someone is openly carrying a firearm; and that they would have converted

5

Hesselink's 911 call into a "signal zero" had he simply reported a man carrying an exposed firearm. Even the plaintiffs' own security expert, Donald Schultz, conceded that a "signal zero" can signify "armed and caution" or "armed and dangerous," and the parties' final joint pretrial statement indicated that it is "police language for an armed person/threat."

Within minutes of dialing 911 (and while he was still on the phone), Hesselink could hear a police helicopter circling overhead and patrol units "coming code three," facts which he relayed to the 911 operator. Nearly a dozen police officers, which included an emergency response team clad in tactical uniforms and equipped with automatic weapons, arrived on the scene. When the film crew eventually exited the mall together, they were confronted by the full contingent of armed officers yelling "watch out for crossfire" and commanding them to lay face down on the ground with their hands behind their backs. The officers handcuffed and frisked some of the group members, briefly questioned them, and then released each and every one of them without charge or arrest. Bartley overheard one of the police officers say, "security lied to us." Once the entire incident had blown over, a number of FIP security personnel, including Chief Hesselink, openly laughed about it.

## II. PROCEDURAL HISTORY

In July 2010, Bartley, Higgs, Woodson, Bryson, Wallace, Ivory, and Sykes filed a civil suit in Florida against FIP and the Sheriff of Orange County, alleging claims under state and federal law for unlawful detention, illegal search, assault and battery, and intentional infliction of emotional distress.[2]  After the case was removed to federal court, Wilson joined the suit and the plaintiffs filed an amended complaint.  That complaint sought compensatory and punitive damages against FIP under Florida law for (1) false detention or imprisonment; (2) illegal search, seizure, and battery; and (3) intentional infliction of emotional distress.  The crux of the plaintiffs' claims against FIP was that "[a]s a direct and proximate result of . . . Chief Hesselink's 911 call to the [police], [they were] physically stopped, forcibly assaulted, detained and forced at gunpoint to lay face first on the ground by the [police] as [they attempted] to leave the Magic Outlet Mall."

FIP moved for summary judgment on each and every claim against it, asserting that the undisputed facts showed that Sykes was openly carrying a firearm in violation of Florida law, which provided probable cause to lawfully detain all of the plaintiffs.  The district court granted the motion as to Sykes'

---

[2] FIP also asserted claims, either in state or federal court, against Kim's Enterprise of Orlando, Inc., the owner of the Magic Outlet Mall, and Chom Kim, the last known member-manager of Magic Mall, LLC.  The district court ultimately entered defaults against both defendants; Kim's Enterprise of Orlando for failing to respond to the plaintiffs' amended complaint, and Chom Kim for failing to comply with the court's case management order. Neither defendant is a party to this appeal.

7

claims given the clear probable cause to detain him for illegally carrying an exposed firearm. But the court denied the motion as to the claims of the seven remaining plaintiffs, observing that FIP had offered no argument or authority to support its "implicit proposition" that the probable cause to detain Sykes "extended to the other Plaintiffs in this case who are not accused of openly carrying a weapon or committing any other violation of law."

Soon after, FIP filed a second motion for summary judgment on the claims of the seven remaining plaintiffs, which the court again granted in part and denied in part. The court granted summary judgment to FIP on the plaintiffs' claims for illegal search, seizure, and battery. But it denied summary judgment on the claims for false detention and intentional infliction of emotional distress, finding that genuine issues of material fact existed as to whether FIP "directly or indirectly procured" the plaintiffs' detention by the police, whether Hesselink's 911 call "went beyond merely providing information" and "was made in good faith," and whether his "conduct in calling 911 in the absence of any cognizable threat was reckless, if not intentional, because [] of the predicable response of local law enforcement officers."

Before trial, the remaining plaintiffs reached a settlement with the Sheriff of Orange County and dismissed their claims against him. The case thus proceeded

to trial on the plaintiffs' claims against FIP for false detention and intentional infliction of emotional distress.

The plaintiffs' theory at trial, which they presented to the jury during opening and closing arguments, was that FIP was liable for false detention because Hesselink intentionally instigated, with malice and in bad faith, the events that culminated in their detention by needlessly calling 911 and then effectively lying to the police when he reported a "signal zero" in the absence of any actual or perceived threat. Critically, the plaintiffs did not contend that the police had acted unlawfully in briefly detaining them in order to investigate the 911 call. To the contrary, the plaintiffs, their attorney, and their own expert witness repeatedly conceded during the course of the trial that the police had acted appropriately under the circumstances.[3] For that very reason, FIP moved for judgment as a matter of law at the close of the plaintiffs' case and again at the close of all the evidence. The district court granted the motion as to the plaintiffs' claims for intentional infliction of emotional distress, but took the remaining portions of FIP's motion under advisement and submitted the surviving claims of false detention to the jury.

---

[3] During opening and closing arguments, the plaintiffs' lawyer frankly acknowledged that the police had "acted appropriately" and "didn't do anything wrong." When Bartley, Higgs, and Wallace were asked on cross-examination whether the police had acted lawfully or appropriately in response to Hesselink's 911 call, each one answered in the affirmative. The plaintiffs' expert witness likewise acknowledged before the jury that the police had acted appropriately for "the type of call" that they had received.

9

The court instructed the jury that in order to hold FIP liable for false detention, it had to find that the private security company intentionally caused the plaintiffs' restraint and that the restraint was unreasonable, unwarranted, and "without lawful authority," meaning that "the Orange County Sherriff's Department did not act under color of or claim of lawful authority."  In accordance with Florida's recognized "privilege of private citizens to provide, without fear of subsequent tort liability, information about suspected criminal activities to law enforcement officials," the court also admonished the jury that "[i]f the private citizen makes an honest, good faith mistake in reporting an incident, the mere fact that his communication to an officer may have caused the victim's restraint does not make him liable when he did not in fact request any detention."  See Pokorny v. First Fed. Savs. & Loan Ass'n of Largo, 382 So. 2d 678, 682 (Fla. 1980).  And on the issue of compensatory damages, the court instructed the jury that if it found FIP guilty of procuring a false detention, it should award a sum that would "fairly and adequately compensate" each plaintiff for his or her "mental anguish, inconvenience, humiliation and loss of capacity for the enjoyment of life."  It cautioned, however, that "[t]here is no exact standard for measuring such damage," only that the measure of damages "should be fair and just in light of the evidence."

During its deliberations, the jury submitted a question to the court about damages:  "If we were to find for the plaintiff's [sic], what monetary guidelines or

10

limits do we have regarding compensatory or/and punitive damages[?]"  Without

disclosing the jury's question to either party or giving them an opportunity to

object to any proposed response, the court reiterated that "there is no exact

standard for measuring [compensatory damages]" and that "[t]he amount should be

fair and just in light of the evidence."  Unlike its response to the punitive damages

portion of the jury's question, which specifically directed the jury to "review . . .

the punitive damages instruction," the court did not expressly refer the jury to the

remainder of its original instructions on compensatory damages, including those

limiting such damages to the mental anguish, inconvenience, humiliation, and loss

of capacity for enjoyment of life suffered by each plaintiff.

The jury returned a verdict in favor of the plaintiffs on their false detention

claims, specifically finding that FIP "participate[d], directly or indirectly by

procurement, in the [plaintiffs'] restraint" and that the restraint was "unreasonable,

unwarranted and without legal authority."  It awarded each of the seven remaining

plaintiffs $50,000 in compensatory damages, for a total of $350,000, and awarded

$2 million in punitive damages, which was later reduced by the court to

$1,050,000, the maximum authorized by Florida law.  See Fla. Stat. § 768.73(1)(a)

(providing that "an award of punitive damages may not exceed the greater of . . .

[t]hree times the amount of compensatory damages awarded to each claimant" or

"[t]he sum of $500,000.").  After the jury issued its verdict, the district court

11

denied FIP's outstanding motion for judgment as a matter of law on the false detention claims and entered judgment in the plaintiffs' favor.

FIP later filed a renewed motion for judgment as a matter of law or, in the alternative, for a new trial. FIP contended that it was entitled to judgment as a matter of law on the plaintiffs' false detention claims for two independent reasons: (1) the undisputed testimony of the plaintiffs and their expert witness established that the police detention was lawful, which necessarily negated any claim for false detention; and (2) Hesselink's 911 call accurately informed the police about the commission of a crime and did not request any particular police response, which meant that FIP could not be held liable for procuring the plaintiffs' detention. FIP alternatively argued that it was entitled to a new trial because the district court failed to disclose the jury's question on damages and its response, by quoting "only a limited portion" of the instruction on compensatory damages, materially altered those instructions. The plaintiffs did not dispute FIP's assertion that their detention at the hands of the police was lawful; instead, they argued that Hesselink had "maliciously" and "without good faith" set the whole incident in motion.

Although the district court agreed that a claim for false detention under Florida law requires proof of an unlawful detention, it nevertheless denied FIP's renewed motion for judgment as a matter of law. The court reasoned that the plaintiffs' trial testimony "[fell] short of undisputed testimony that [the police]

12

detention of Plaintiffs was lawful," that "there was sufficient evidence before the jury to support a finding that Plaintiffs' restraint by [the police] was unlawful," and that "[t]he jury was free . . . to come to its own conclusion about the lawfulness of the detention by [the police]."  The court also denied FIP's request for a new trial, observing that it was not required to "assemble the attorneys to go over" the jury's question on damages, particularly given that the question was "rather simple," and that its response to the jury's question did not alter the given instructions on compensatory damages.

## III. DISCUSSION

FIP challenges the district court's denial of its renewed motion for judgment as a matter of law, contending that the challenged detention by the Orange County Sheriff's Department was not unlawful and, in any event, that it cannot be held liable for procuring that detention based solely on Hesselink's 911 call, which accurately reported that Sykes was illegally carrying an exposed firearm.[4]  The plaintiffs do not directly respond to the contention that their police detention was lawful; instead, they assert that FIP's position "begs" the "dispositive" question of whether Hesselink's actions in calling 911 and reporting a "signal zero" were motivated by malice.  From that premise, they argue that FIP is not entitled to

---

[4] For identical reasons, FIP also challenges the district court's partial denials of its two motions for summary judgment.  A party may not, however, appeal an order denying summary judgment after there has been a full trial on the merits. Ortiz v. Jordan, — U.S. —, 131 S.Ct. 884, 888–89 (2011); see also Pensacola Motor Sales Inc. v. E. Shore Toyota, LLC, 684 F.3d 1211, 1219 (11th Cir. 2012).

judgment as a matter of law because the jury reasonably could have found that Hesselink, after determining that Sykes did not pose an imminent threat and after letting him enter the mall, should never have called 911, effectively lied to the police by reporting a "signal zero," and did so in bad faith and in retaliation for Ivory's comment that he was a "'wannabe' cop."

We review de novo the denial of a motion for judgment as a matter of law, which "may be granted only if after examining all evidence in a light most favorable to the non-moving party . . . there is no legally sufficient evidentiary basis for a reasonable jury to find for that party" on a controlling legal issue. Myers v. TooJay's Mgmt. Corp., 640 F.3d 1278, 1287 (11th Cir. 2011) (quotation marks omitted); see also Fed. R. Civ. P. 50(a). If the "facts are sufficiently clear that the law requires a particular result," the court should remove the case or certain issues from the jury's consideration. Weisgram v. Marley Co., 528 U.S. 440, 448, 120 S.Ct. 1011, 1017 (2000).

We agree with FIP that it was entitled to judgment as a matter of law on the plaintiffs' false detention claims because the plaintiffs did not, and could not, establish an essential element of those claims — that their brief detention at the hands of the Orange County Sheriff's Department was unlawful.[5] In Florida, the

---

[5] Given the clear absence of a false or unlawful detention, we need not address FIP's alternative argument that it was entitled to judgment as a matter of law because Hesselink's actions in calling 911 cannot serve as a basis for imposing tort liability. We also agree with FIP

largely synonymous torts of false arrest, false detention, and false imprisonment are "defined as 'the <u>unlawful restraint</u> of a person against his will, the gist of which action is the <u>unlawful detention</u> of the plaintiff and the deprivation of his liberty.'" <u>Escambia Cnty. Sch. Bd. v. Bragg</u>, 680 So. 2d 571, 572 (Fla. 1st DCA 1996) (quoting <u>Johnson v. Weiner</u>, 19 So. 2d 699, 700 (Fla. 1944)) (emphasis added); <u>see also</u> <u>Mathis v. Coats</u>, 24 So. 3d 1284, 1289 (Fla. 2d DCA 2010) ("The essential elements of a cause of action for false imprisonment include: (1) the <u>unlawful detention</u> and deprivation of liberty of a person; (2) against that person's will; (3) <u>without legal authority</u> or 'color of authority'; and (4) which is unreasonable and unwarranted under the circumstances.") (emphasis added).  At a bare minimum, a plaintiff asserting a Florida claim for false detention must establish detention "contrary to his will and the unlawfulness of the detention."  <u>Johnson v.</u>

---

that the district court erred in responding to the jury's question on damages without first notifying the parties of its contents and affording them an opportunity to be heard. <u>See</u> <u>Rogers v. United States</u>, 422 U.S. 35, 39, 95 S.Ct. 2091, 2095 (1975) ("[T]he jury's message should have been answered in open court and [the] petitioner's counsel should have been given an opportunity to be heard before the trial judge responded."); <u>Fillippon v. Albion Vein Slate Co.</u>, 250 U.S. 76, 81, 39 S.Ct. 435, 436 (1919) ("In this case the trial court erred in giving a supplementary instruction to the jury in the absence of the parties and without affording them an opportunity either to be present or to make timely objection to the instruction."); <u>United States v. McDuffie</u>, 542 F.2d 236, 241 (5th Cir. 1976) ("When a communication is received from the jury, counsel should be informed of its substance and afforded an opportunity to be heard before a supplemental charge is given.").  But FIP's entitlement to judgment as a matter of law on the plaintiffs' sole surviving claims for false detention obviates any need for us to consider whether that error was harmless. <u>See</u> <u>McDuffie</u>, 542 F.2d at 241 (recognizing that judicial errors of this kind are subject to harmless error review).

15

Barnes & Noble Booksellers, Inc., 437 F.3d 1112, 1116 (11th Cir. 2006) (quoting Rivers v. Dillards Dep't Store, Inc., 698 So. 2d 1328, 1331 (Fla. 1st DCA 1997)).

Tracking the definition of a false detention, the district court instructed the jury that FIP could not be held liable unless the police had acted "without lawful authority" in detaining the plaintiffs. Yet the plaintiffs, their attorney, and their own expert witness conceded throughout every phase of the trial, including in opening and closing arguments, that the police had "acted appropriately" and "didn't do anything wrong" in detaining them. Those concessions, coupled with the plaintiffs' complete failure to even suggest to the jury that the police detention was unlawful, fatally undermined their claims for false detention. Cf. N. Ins. Co. of N.Y. v. Chatham Cnty., Ga., 547 U.S. 189, 195, 126 S.Ct. 1689, 1694 (2006) (finding a defendant's concession below that it was not entitled to sovereign immunity to be dispositive on that question); Ross v. Jefferson Cnty. Dep't of Health, 701 F.3d 655, 661 (11th Cir. 2012) (holding that the plaintiff's deposition testimony that she did not feel "like her termination had anything to do with her race" was sufficient to warrant summary judgment in the employer's favor on her racial discrimination claim) (brackets and ellipsis omitted).

The plaintiffs' unflagging contention that the lawfulness of the police detention is irrelevant because Hesselink's actions in calling 911 were motivated by malice and born of bad faith is sharply at odds with Florida law, the district

16

court's jury instructions, and the very nature of the claim that they chose to bring. See, e.g., Johnson, 19 So. 2d at 700; St. Petersburg v. Austrino, 898 So. 2d 955, 957 (Fla. 2d DCA 2005) ("The gravamen of the tort of false arrest is the unlawful restraint of a person against that person's will."); Escambia Cnty. Sch. Bd., 680 So. 2d at 572.  As the Florida Supreme Court has explained, if the challenged detention or "imprisonment is under legal authority it may be malicious but it cannot be false." Johnson, 19 So. 2d at 700.  In other words, the subjective motives skulking behind a detention are irrelevant if that detention is lawful. Cf. Graham v. Connor, 490 U.S. 386, 397, 109 S.Ct. 1865, 1872–73 (1989) (emphasizing that "the subjective motivations of the individual officers," including whether they acted maliciously or in bad faith, have "no bearing on whether a particular seizure is 'unreasonable' under the Fourth Amendment").  Indeed, if Hesselink's allegedly malicious motives in calling 911 were enough to sustain liability on a false detention claim, it is difficult to see why the district court granted summary judgment in favor of FIP on Sykes' false detention claim; it was the same call, made for the same purpose, with the same motive that led to the detention of the entire film crew as they exited the mall together.

Even without the plaintiffs' concessions and fundamentally flawed theory of liability, the probable cause to detain Sykes for illegally carrying an exposed firearm authorized the police to briefly detain the plaintiffs — all of whom

17

accompanied Sykes as he exited the mall — to ensure officer safety.[6] "[F]or safety reasons, officers may . . . briefly detain individuals about whom they have no individualized reasonable suspicion of criminal activity in the course of conducting a valid [investigatory] stop as to other related individuals," particularly when the officers are — as they were here — operating in "the known presence of firearms." United States v. Lewis, 674 F.3d 1298, 1306, 1309 (11th Cir. 2012); see also Maryland v. Wilson, 519 U.S. 408, 415, 117 S.Ct. 882, 886 (1997) (holding that an officer making a valid traffic stop of a driver "may order passengers to get out of the car pending completion of the stop" to ensure officer safety); Michigan v. Summers, 452 U.S. 692, 702–03, 101 S.Ct. 2587, 2594 (1981) (holding that officers conducting a valid search of a residence may detain an occupant without probable cause in order to minimize "[t]he risk of harm to both the police and the occupants"); United States v. Clark, 337 F.3d 1282, 1285 (11th Cir. 2003) ("[A]n officer may 'control' persons not suspected of wrongdoing if they are near a street encounter with persons reasonably suspected of criminal activity."); Hudson v.

---

[6] Although FIP, in moving for judgment as a matter of law, did not specifically argue — as it does on appeal — that the police were entitled to detain the plaintiffs to ensure officer and public safety, it did make the broader claim that the challenged detention was lawful. Having preserved that broader claim in the district court, FIP is not precluded from raising new arguments in support of that claim on appeal. See Yee v. City of Escondido, 503 U.S. 519, 534, 112 S.Ct. 1522, 1532 (1992) ("Once a federal claim is properly presented, a party can make any argument in support of that claim; parties are not limited to the precise arguments they made below."); Pugliese v. Pukka Dev., Inc., 550 F.3d 1299, 1304 n.3 (11th Cir. 2008) ("Although new claims or issues may not be raised [for the first time on appeal], new arguments relating to preserved claims may be reviewed on appeal.").

18

Hall, 231 F.3d 1289, 1297 (11th Cir. 2000) ("[A] police officer performing his lawful duties may direct and control — to some extent — the movements and location of persons nearby, even persons that the officer may have no reason to suspect of wrongdoing."); State v. Cromatie, 668 So. 2d 1075, 1077 (Fla. 2d DCA 1996) (holding that an officer conducting a valid traffic stop could "detain all occupants of the car until he completed the search"); Williams v. State, 640 So. 2d 1206, 1208 (Fla. 2d DCA 1994) (holding that an officer who had probable cause to arrest a fleeing car occupant could briefly detain the other occupants while he gave chase because it was "a reasonable and necessary response to the exigent circumstances confronting the deputy that demanded immediate action").[7]

---

[7] The police were also authorized to briefly detain the plaintiffs without individualized suspicion of wrongdoing under the exigent circumstances exception to the Fourth Amendment's usual requirements, which permits law enforcement to conduct a suspicionless search or seizure when confronted with an emergency situation that, among other things, requires immediate action for the protection or preservation of life. See Mincey v. Arizona, 437 U.S. 385, 392, 98 S.Ct. 2408, 2413 (1978) ("We do not question the right of the police to respond to emergency situations. . . . The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency.") (quotation marks omitted); Seibert v. State, 923 So. 2d 460, 468 (Fla. 2006) ("[P]olice may enter a residence without a warrant if an objectively reasonable basis exists for the officer to believe that there is an immediate need for police assistance for the protection of life or substantial property interests."); Campbell v. State, 477 So. 2d 1068, 1070 (Fla. 2d DCA 1985) ("The preservation of human life is paramount to the right of privacy protected by search and seizure laws . . . ."). In light of Hesselink's 911 call reporting two "signal zeros" in the mall, one of whom was openly carrying a firearm and wearing a battle dress uniform, the police officers had an objectively reasonable basis for concluding that they were facing a potentially life-threatening emergency, which justified the brief detention of Sykes and his companions until the officers could investigate the situation and allay any fears of a possible threat. See In re J.B., 621 So. 2d 489, 491 (Fla. 4th DCA 1993) ("A 911 call is a cry to the authorities for help. And until the investigating officer is reasonably satisfied that no emergency exists, he is within his legal duty to investigate such calls in a manner consistent with their emergency nature.").

In denying FIP's renewed motion for judgment as a matter of law, the district court reasoned that the plaintiffs' trial testimony "[fell] short of undisputed testimony that [the police] detention of Plaintiffs was lawful," that "there was sufficient evidence before the jury to support a finding that Plaintiffs' restraint by [the police] was unlawful," and that the "jury was free to . . . come to its own conclusion about the lawfulness of the detention."  The court emphasized that the video of the police detention "depicted the [Sheriff's Department] detaining everybody in the group, male and female, even though they were not accused of openly carrying a weapon or committing any other violation of law."  Each of the court's underlying premises, stated or unstated, is wrong.

First, the district court's assessment of the plaintiffs' trial testimony wholly ignored the fact that their entire theory of liability, as presented to the jury and reiterated on appeal, is contrary to Florida law and the court's own jury instructions, both of which required a showing that the police detention was false or unlawful.  Second, the court erroneously surmised that the lawfulness of a detention is ultimately a factual question for a jury to decide, not a legal question to be resolved by a court.  See Alamo Rent-A-Car, Inc. v. Mancusi, 632 So. 2d 1352, 1357 (Fla. 1994) ("When the facts relied on to show probable cause are in dispute, their existence is a question of fact for the determination of the jury; but their legal effect, when found or admitted to be true, is for the court to decide as a

20

question of law.") (quotation marks omitted) (emphasis added). In the context of a motion for judgment as a matter of law, where the evidence must be construed in the light most favorable to the non-moving party, the question of whether a particular detention was lawful is a "pure issue of law." Cf. Cottrell v. Caldwell, 85 F.3d 1480, 1486 n.3 (11th Cir. 1996) ("In determining the facts for summary judgment purposes, we, like the district court, are required to view the evidence in the light most favorable to the plaintiff. When that is done, a pure issue of law is created.").

Finally, the court also mistakenly assumed that the Sheriff's Department could detain the plaintiffs only if it had individualized suspicion that they themselves had committed a crime. But as we have explained, "individualized suspicion is not an absolute prerequisite" for every lawful detention, including where — as here — the police briefly detain members of a group while they investigate suspected criminal activity of a nearby associate. See Lewis, 674 F.3d at 1305, 1308 ("Once the officers had [reasonable suspicion of criminal activity], they were not obliged to let three of the four associated individuals walk about freely while they investigated McRae, in light of the officers' powerful concern for their own safety."); see also Samson v. California, 547 U.S. 843, 855 n.4, 126 S.Ct. 2193, 2201 n.4 (2006) ("The touchstone of the Fourth Amendment is reasonableness, not individualized suspicion.").

21

In sum, even when the evidence is viewed in the light most favorable to the plaintiffs, there was no legally sufficient basis to conclude that they had been unlawfully detained by the police, an essential element of their claims for false detention.  See Myers, 640 F.3d at 1287.  The plaintiffs simply cannot prevail on a false detention claim absent a false detention.  Contrary to the district court's decision, FIP is entitled to judgment as a matter of law on the plaintiffs' sole remaining claims for false detention, including the compensatory and punitive damages awarded on those claims.  We therefore reverse the district court's denial of FIP's renewed motion for judgment as a matter of law and remand with instructions that the court enter judgment for FIP.

**REVERSED AND REMANDED.**